UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

SHEILA KILLEN,             )
                             )
      *Plaintiff,*       )
                             )     No. 2:17-CV-145
v.                       )
                             )     Judge Collier
WALGREEN CO.,         )     Magistrate Judge Corker
                             )
      *Defendant.*     )

# M E M O R A N D U M

Before the Court is a motion for summary judgment by Defendant, Walgreen Company. (Doc. 27.) Plaintiff Sheila ("Krys") Killen has responded (Doc. 34), and Defendant has replied (Doc. 38). Also before the Court is a motion by Defendant to strike affidavits and exhibits filed by Plaintiff. (Doc. 40.) Plaintiff has responded (Doc. 42), and Defendant has replied (Doc. 44). For the following reasons, the Court will **DENY** Defendant's motion to strike (Doc. 40), and **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment (Doc. 27).

The Court will **GRANT** the motion for summary judgment as to Plaintiff's claims for age discrimination and maintaining a hostile work environment under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623, 626; for sex discrimination, age discrimination, and through maintaining a hostile work environment under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-401(a), 4-21-311; and for disability discrimination, and through maintaining a hostile work environment under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12102, *et seq.* The Court will **DENY** the motion as to Plaintiff's claims for retaliation under the ADEA, the THRA, and the ADA.

# I.   <u>BACKGROUND</u>

This action concerns Plaintiff's five years of employment with Defendant Walgreen Company ("Walgreen").  (Doc. 25.)[1]  The allegations span three different store locations, and Plaintiff's complaint invokes ten different causes of action.  (*See id.*)

Plaintiff is a fifty-nine-year-old white female.  (Doc. 37 ¶ 1.)  She is a breast cancer survivor and also suffers from a heart condition which has required hospitalization.  (*Id.* ¶ 2.)[2]

Plaintiff began her employment with Walgreen in August 2011 as a customer service representative at its Johnson City State of Franklin Road retail store and pharmacy (the "Johnson City store").  (*Id.* ¶ 3.)   Prior to her start, the woman who would serve as Plaintiff's manager, Renee Burleson, told current employees that Plaintiff was not a real blonde, was "not all there," did not have any sense, and could not get the job done.  (Doc. 35 at ¶ 4.)  Once Plaintiff started working at the Johnson City store, Burleson used the word "stupid" to describe Plaintiff's work activities to other employees, talked to Plaintiff in a condescending voice, and raised her voice or yelled at her for taking too much time on tasks.  (*Id.* ¶¶ 8-11.)  Burleson called Plaintiff "She She," and made her wear a name tag reflecting the name "She She," in spite of Plaintiff's protests.  (*Id.* ¶¶ 9, 12; Doc. 37-1.)

---

[1] In reciting relevant factual background, the Court has viewed the evidence in the light most favorable to Plaintiff and drawn all reasonable inferences in her favor.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court additionally relies on affidavits subject to Defendant's motion to strike (Doc. 40), for reasons stated below.

[2] On April 22, 2019, Plaintiff, through counsel, informed the Court that she has been diagnosed with recurring breast cancer, and is currently undergoing additional surgery and radiation treatments.  (Doc. 45 at 1.)  Because Plaintiff would not have been able to participate in any upcoming pre-trial filings, or attend her trial as scheduled, the Court continued deadlines in this matter pending further order.  Plaintiff's next status report regarding her condition is due to the Court on or before September 2, 2019.  (Doc. 48.)

Plaintiff complained to the store manager, Tim Mullins, who transferred Plaintiff to a new location—the Broadway-Unaka Walgreen store (the "Broadway-Unaka store"). (Doc. 35 ¶ 21; Doc. 37 ¶ 3.) Plaintiff got along well with her new manager, Winston Richey, received several promotions, and was named as one of the store's shift leads. (Doc. 35 ¶ 21; Doc. 36 ¶ 7.) Plaintiff worked as shift lead for approximately eight months, until Burleson was transferred to be her supervisor once again, but now at the Broadway-Unaka store. (Doc. 36 ¶ 8.) Plaintiff received several written reprimands from Burleson, but Plaintiff refused to sign them because she found them unjustified. (Doc. 37 ¶ 13.) The reprimands were discipline for incurring overtime by clocking out late, taking a cell phone call in the restroom, refusing to answer intercom pages, and for telling a younger male associate "go play with yourself." (Doc. 37 ¶¶ 14-16, 20-28, 40.) The bases of the written warnings were not always factually correct, or were exaggerated—for instance, Plaintiff observed that the younger male associate was playing with a rubber ball and Plaintiff said, or intended to say, "go play by yourself." (*Id.* ¶ 26.) Because of daily hostility from Burleson, Plaintiff became a "nervous wreck" at Walgreen. (*Id.* ¶ 38.)

On December 3, 2015, Plaintiff emailed District Manager Gregg McCollum stating that she could no longer work under Burleson. (*Id.* ¶ 43.) She also called Walgreen's complaint hotline the next day and described the work environment Burleson had created. (*Id.* ¶ 44.) After speaking with a hotline representative and meeting with McCollum personally, Plaintiff requested a transfer to Walgreen's Boone's Creek store location (the "Boone's Creek store"). (*Id.* ¶ 47.) On December 9, 2015, Plaintiff also emailed Randy Reddick, Walgreen's Director of Pharmacy and Retail Operations, about her concerns. (*Id.* ¶ 53.)

Within two weeks of her complaint to McCollum, McCollum transferred Plaintiff to Walgreen's Piney Flats store location (the "Piney Flats store"), instead of the Boone's Creek store

which she had requested. (*Id.* ¶ 55.) Plaintiff found the transfer "unusual" because there was no existing shift lead vacancy at the Piney Flats store, but there was a vacancy at the Boone's Creek store. (*Id.*) The female shift lead at the Piney Flats store, Cathleen Bradshaw, was approximately eight to nine years younger than Plaintiff. (*Id.* ¶ 56.) Within a week of Plaintiff's start at the Piney Flats store, Bradshaw was transferred to the Boone's Creek store to fill the vacancy Plaintiff had requested to fill. (*Id.* ¶ 58.)

Plaintiff was not happy to be transferred to the Piney Flats store because she had heard that the manager, Robert Leigh, was a difficult manager. (*Id.* ¶ 57.) Leigh was "cool" toward Plaintiff from the start. (*Id.* ¶ 59.) In late December 2015, Leigh approached Plaintiff from behind and told her in a "somewhat threatening tone," "if you feel like you're being watched, you are." (*Id.* ¶ 59.) He then added "I am watching you." (*Id.*) This remark unnerved Plaintiff and made her continuously on edge for the rest of her employment at the Piney Flats store. (*Id.*) Leigh also started slamming management store books down on his desk in order to startle Plaintiff, and once vented his anger by shoving a metal dolly towards her. (*Id.* ¶ 60-61.)

Plaintiff began experiencing persistent chest pain. (*Id.* ¶ 62.) Plaintiff went to the emergency room on January 1, 2016, and was hospitalized at length due to a significant blockage in one of her arteries. (*Id.*) She missed six weeks of work during recovery, and returned on February 22, 2016. (*Id.*)

Leigh informed a claims manager via an email sent January 11, 2016 that the store would not be able to accommodate a shift lead returning to work on "restricted duty," but that the shift lead would otherwise need to be able to perform "heavy work," as described in the shift lead job duties. (*Id.* ¶ 65; Doc. 37-11.)

When Plaintiff returned to work, Leigh and Pharmacy Manager Matt Lunsik met with Plaintiff, and gave her a verbal warning about her failure to complete a "smart count"[3] and other work assignments in late December, before her hospitalization. (Doc. 37 ¶ 66.) At the meeting, Leigh told Plaintiff she would be discharged if her performance did not improve. (*Id.* ¶ 66.)

The next day, February 23, 2016, Leigh and McCollum met with Plaintiff. (*Id.* ¶ 67.) They told her she was getting a "new start" with Walgreen. (*Id.*) During the meeting, Leigh also told Plaintiff that she was "too slow." (*Id.*) Leigh met with Plaintiff once a week thereafter. (*Id.*) Leigh told Plaintiff that she needed to work faster. (*Id.*)

On April 8, 2016, Leigh told Plaintiff that he had seen some improvement in her work and that Plaintiff would need to continue to show "major improvement" during the next month. (*Id.* ¶ 68.) Leigh then began assigning Plaintiff "self-improvement articles" to read, and required Plaintiff to write one-page essay commentaries on what Plaintiff gleaned from each article. (*Id.*) Leigh did not block off time during the day for her to complete the articles, so Plaintiff read them after she got home from work each night. (*Id.* ¶ 70.) On April 11, 2016, Leigh assigned Plaintiff two articles to read, but Plaintiff could not get both of the assignments done in one week. (*Id.* ¶ 77.) On one occasion, Plaintiff was given leave to select an article to read, but when she turned in her essay, Leigh told her she had chosen the "wrong one," and directed her to read and write an essay on a different article of his choice. (*Id.* ¶ 78.) Plaintiff did not see any relevance in reading articles about time management, as Walgreen prioritized her job duties and planned her work day for her through assignment sheets which listed chores to be performed between predetermined times. (*Id.* ¶ 79.)

---

[3] A "smart count" involved walking to the store's pharmacy, beauty department, and grocery department with a hand scanner, and entering at least five and up to twenty inventory items into the scanner for that day. (*Id.* ¶ 110.)

Leigh had successfully utilized the method of assigning articles and essay summaries with a male pharmacist whom he had supervised. (Doc. 29 ¶ 10.) The self-improvement articles were available through a Walgreen employee-improvement "library," and related to an employee's discretionary activities and personality development. (Doc. 36 ¶ 19.)

At some point during the spring of 2016, Leigh showed Plaintiff into the storeroom and pointed out several cardboard boxes containing gallon jugs of liquid detergent sitting atop the storage shelves. (Doc. 37 ¶ 71.) Each box contained four one-gallon jugs of liquid detergent, and weighed nearly fifty pounds each. (*Id.*) Plaintiff was instructed to put the boxes on the floor. In order to do so, she had to get a step ladder, open each box, take each jug out separately, and go down the ladder with each jug. (*Id.* ¶ 72.) Leigh later had Plaintiff repeat the same task after someone placed the boxes back onto the shelf. (*Id.* ¶¶ 74-75.) Plaintiff believed Leigh was attempting to convince her to resign. (*Id.* ¶ 76.)

From May to June of 2016, Plaintiff discovered that the Piney Flats store's side-door had been left unlocked and ajar on three different occasions during her evening security walk. (*Id.* ¶ 92.) The side door could not be unlocked unless a manager used a key to open the door and turn off an alarm. (*Id.*) Each time Plaintiff found the door open, she reported the incident to Leigh. (*Id.*) Because the door continued to be left ajar, Plaintiff believed Leigh was setting her up to accuse her of missing the open door during her security check. (*Id.*)

On June 7, 2016, Leigh and Lunsik met with Plaintiff and placed her on a Performance Improvement Plan (a "PIP"). (*Id.* ¶ 93.) Under the PIP, Leigh assigned seven more self-improvement articles. (Doc. 28-11 at 6.) Leigh's notes on meetings with Plaintiff in the PIP reflected the following, errors in original:

- 12/15/15 - Initial meeting, laid out the expectation of working at this location

• 2/22/16 - Conducted meeting that was to happen on 1/4, meeting did not happen due to her medical leave, reviewed: 1) My concerns toward her performance before she went out on leave 2) her options 3) retraining process 4) Steps if her performance does not improve. (Matt Lunsik was present for this meeting)

• 2/22/16 - A verbal warning was issued for not completing assigned task. (Matt Lunsik was present for this meeting)

• 2/23/16 - (with District Manager Greg McCollum) expressed that she wanted a fair shot. He explained that this was a new start, also that I communicated in December that yesterdays meeting was going to take place.

• 3/2/16 - reconfirmed the verbal warning from last week. COMPASS, PPL's overdue & smart count not completed. Also reviewed the following 1) Checklist 2) COMPASS 3) Sense of urgency 4) Time management 5) Communication 6) multi tasking. (Matt Lunsik was present for this meeting)

• 3/4/16 - Asked for update on PPL's, she said she was working on them. I explained that they were already overdue and needed to be completed.

• 3/7/16 - Recapped her day on Friday 3/4, Not much work was completed, explained that she needed to speed things up, she has one pace, very slow. Told her she must manage her time, 48 Minutes of overtime in the last pay week. (Matt Lunsik was present for this meeting)

• 3/9/16 - Gave her the HMM on time management. Explained that this was not required , but I thought it might help her

• 3/10/16 - 28 minutes of overtime last week. Explained that she was to have no overtime going forward unless approved by me.

• 3/14/16 - Hanging of ad tags must be done before store opens. Let her know that training with Christy on Friday went well according to Christy (Randy Kind &. Matt Lunsik were present for this meeting)

• 3/18/16 - Reviewed the following 1) Working the list and leading your team 2) Taking lunches 3) Code green, attitude toward the pharmacy techs. (Matt Lunsik was present for this meeting)

• 3/22/16 - Reviewed COMPASS, expiring call-ins & PLP project

• 3/23/16 - Reviewed Leading people, sense of urgency & Communication.

• 3/26/16 - Let her know to page me when she could not get to a call. Coached her on working the list, both her and Taylor working OSA (not even on the list) with truck sitting in the stockroom. Also spoke about time management & worrying about what she is doing instead of Randy (ASM) & Christy (SFL) are doing

• 3/30/16 - Spoke about previous day when I was out sick. Not much work completed.

• 4/1/16 - Got her feedback on how she thought everything was going to help prep for her 30 day check-in

• 4/8/16 - Coached on pharmacy issue from previous night

• 4/8/16 - 30 day check-in. Explained that I was not ready to issue a verbal warning at this time due to starting to see some improvement, and that major improvement was needed in the next 30 days. Also explained that I was going to use a different approach using some reading to help with the problem areas. 60 day check in scheduled for 5/9/16 (Matt Lunsik was present for this meeting)

• 4/11/16 - Assigned 2 articles "sense Of Urgency" & "Time Trap" 4/12/16 - Expressed that 2 articles by Monday might be too much. Changed it to 1 article

• 4/14/16 - coached on front end ECC

• 4/18/16 - Reviewed article "Time Trap". Changes coming in Cosmetic Dept.

• 4/25/16 - "Sense Of Urgency" article due. Not completed. Spoke about time management

• 4/26/16 - Reviewed article & assigned the next one "Make Every Second Count", discussed duties & task issues

• 5/4/16 - Reviewed article "Make Every Second Count". Discussed overdue PPL.

• 5/9/16 - 60 day check-in. Explained that this check in was going to be her verbal warning for overall performance. Discussed issues. She stated that there were too many interruptions and that I expected to much. Assigned her next article "The Up Side Of Stress" 90 day check in scheduled for 6/6/16 (Matt Lunsik was present for this meeting)

• 5/19/16 - Reviewed checklist. Stress article, expectations, reviewed the SFL job description

• 5/20/16 - Reviewed pricing/inventory checklists from previous day

• 5/23/16 - Reviewed pricing/inventory checklists again, cooler/freezer temp log also

• 5/31/16 - Reviewed weekend performance and notes for current day due to new crew members

• 6/1/16 - Reviewed issues from the the previous night

• 6/13/16 - Issued verbal warning for overtime. Had overtime in each of the last 3 pay periods

(Doc. 28-11 at 4-5.)  Leigh noted that the competencies in which Plaintiff needed improvement were people leadership, functional competency, operations/business leadership, communication, time management, multitasking, and sense of urgency.  (*Id.* at 5-6.)  In the portion of the PIP where Plaintiff could provide her own comments, she wrote the following, errors in original,

> since I have been transferred to this store I have had my position threatening, harassed , singled out and been told to write summarys and was a secret between the pharmacist matthew and mr. leigh, and was told not to tell anyone else. I thinks when I was transfer to this store and the reason why I was really transfer to this

store, mr. leigh says he don't know and don't care. I am contacting the EECO for help, policy state this harassment, and I have email Mr. McCollum, and I have done everthing he have ask and will but the harrassement has to stop and the threats to. I will not sign this because I don't agree with it. I will do the assignment and I have done everthing he ask.

(*Id.* at 10.)  In the "30 Day PIP Follow-up" portion of the PIP, Leigh entered the following comments,

> • Assignment due 7/8 turned in late (partially turned in on 7/11, rest turned in on 7/12).
> • Assignment due 7/15 turned in late (turned in at 9am on 7/20, Left from the previous night).
> • Assignment due 7/22 not turned in, as of the start of the 30-day check in meeting on 7/25 @ 3:15pm.
> • 1 out of 5 assignments completed in the TMP, The 4 not completed have not been started in the TMP. Has just done the work based off the articles that have been printed that are attached to the TMP assignment.
> • Summaries have been very well written, but the explanation of how she is going to use what she has learned is vague. Would like for her to explain how she is using what she has learned in weekly meetings.
> • Monthly Cigarette and liquor inventory - came in at 6am to complete before store opened, cigarette inventory was not posted till 10:45am. Liquor inventory was not posted at all (posted by ASM the following day).
> • OSA - not being completed correctly. On hand quantities not being adjusted, holes in basic departments not being filled, excess inventory not being done correctly.
> • Needs to follow the daily list. Both with the team and herself (7/8 told to concentrate on OSA, Not completed correctly, did call ins which were not on the list) (7/7 truck not finished but had Joe working on out of dates)
> • Communication - Does not want to escalate issues with front end team members to the ASM but then uses them during weekly meetings as reasons for things not getting done.
> • Needs to admit when she does not know something - Customer with Hallmark coupon that didn't get issued points. When handed service recovery instructions, was very adamant she knew how to do it. Video shows her trying to help the customer for 5 minutes, even though she said the customer would not wait to be helped.
> • Cash report - needs to become comfortable with editing the cash report
> • Vendors - Some vendors have expressed concerns on the amount of time it takes to get checked in by Krys

        • Team member engagement - a few team members are still expressing concerns about how Krys speaks about other members of leadership.

        The following improvements have been made and need to continue
        • Following through on daily and weekly check list throughout the store
        • Call Ins - have stayed on top of them as needed
        • Store condition (straightening) - Leaves store in good condition when closing (never been an issue)

(*Id.* at 13-14.)

As to the comment that Plaintiff was slow in helping vendors unload their trucks, the Walgreen delivery drivers otherwise told Plaintiff they were glad to see her waiting to help them unload their trucks because Leigh was "mean" to them. (Doc. 37 at ¶ 124.) Leigh did not schedule enough sales associates to work one Saturday morning, so Plaintiff had to unload most of the store's incoming shipment by herself. (*Id.* ¶ 125.)

As to Plaintiff's failure to complete the liquor inventory, Leigh's criticism ignores the fact that Plaintiff had never been trained to do the liquor inventory. (*Id.* ¶ 114.) Plaintiff states that the Broadway-Unaka store did not sell beer or wine, and that Leigh did not order Plaintiff to do a liquor inventory at the Piney Flats store until she had been in the middle of her PIP. (*Id.*) Plaintiff's shift ended before she could figure out how to complete the task. (*Id.*)

In early summer, a younger male employee, Chris Wolfe, also began working at the Piney Flats store as a shift lead. (Doc. 37 at ¶ 95.) Plaintiff and Wolfe used the same weekly checklists to assist in completing each of their respective shift lead tasks, and it was not unusual for each shift lead to be unable to complete and initial every assigned task on the checklists. (*Id.* ¶¶ 95-96.) Plaintiff had more difficulty completing every task because, after she was placed on the PIP, Pharmacy Manger Lunsik had her stay longer in the pharmacy in order to help out there. (*Id.*

¶ 118.) Plaintiff felt this to be a deliberate attempt to delay Plaintiff from getting back to her floor shift lead duties because Lunsik knew that Leigh had accused Plaintiff of working too slowly. (*Id.*)

Plaintiff observed that Wolfe was not properly doing his job because the store shelves were a mess when Plaintiff would come in to start her shift. (*Id.* ¶ 120.) Wolfe also once left an office safe open with the store keys in it. (*Id.* ¶ 98.) During Leigh and Plaintiff's PIP meetings, Plaintiff attempted to explain the difficulties she was experiencing with getting all of her work done each day, and pointed out that Wolfe was not able to get everything done during his shift either. (*Id.* ¶ 119.) Leigh told Plaintiff to stop blaming others and to worry about her own job performance. (*Id.* ¶¶ 119-120.)

Plaintiff advised McCollum on June 17, 2016 by email that Leigh's harassment was continuing, and that she was complaining to the EEOC. (*Id.* ¶ 100.) McCollum, along with a female manager from Walgreen's Blountville store, met with Plaintiff about her complaint. (*Id.*) Plaintiff also telephoned the Walgreen hotline with her complaint. (*Id.* ¶ 101.) After Leigh found out about the complaint, Leigh told Plaintiff that he did not care if Plaintiff "turned him in" to the EEOC. (*Id.* ¶ 102.)

On June 23, 2016, Plaintiff found the store's back door open during her security walk, and she again believed Leigh was setting her up for discharge. (*Id.*) Three days later, Leigh advanced the due-date of a self-improvement essay, texting her that she would have to have the essay in early or have it counted as "late." (*Id.* ¶ 103.)

At some point in July 2016, Plaintiff noticed that Leigh was "leering" at her backside when she stood in his office making entries in the computer. (*Id.* ¶ 115.) On another occasion where Leigh was staring at Plaintiff from behind, he asked if she had cut her hair; when Plaintiff said

"no," he asked several more times. (*Id.* ¶ 116.) Later that day, Leigh asked if Plaintiff had new shoes; when Plaintiff said "no," he asked several more times. (*Id.* ¶ 117.)

On July 15, 2016, Plaintiff met with McCollum and the female Blountville store manager. (*Id.* ¶ 122.) Plaintiff described how Leigh was requiring her to read articles and write essays after work, and complained that Lunsik had used the word "fuck" to her during a PIP meeting. (*Id.*) Plaintiff also complained about Leigh staring at her backside, commenting on her hair and shoes, and placing her on a "secret" PIP. (*Id.*) McCollum's comments to Plaintiff indicated that he supported Leigh's placement of Plaintiff on a PIP, as well as Leigh's decision to assign Plaintiff to read articles and write short essays. (*Id.*)

On July 19, 2016, Leigh emailed Michelle Stephens in Walgreen's Human Resources Department, stating the following,

> I wanted to follow up with you the PIP for my SLF Krys (Sheila) Killen. We have had very little improvement in her performance. The 30 day check in was scheduled for today. After speaking with my DM, he suggested I put the meeting on hold until I could speak with you. The eLearning assignment due on 7/8 was not completely turned in until 7/12. The assignment due 7/15 as of this morning is still not turned in. When I delivered the PIP, I explained that I would not ask for the assignment, That it was her responsibility to have it in on time. I also explained that she needed to take the time during the afternoon when there was overlap of leadership, to complete the work. Both me and my DM think she is trying to test me. My plan was to address this at the 30 day check in. The question has come up, that with her not being on time 2 week in a row and currently being 4 days late on the assignment due 7/15, what steps should be taken and is this ground for termination? Any advice you can would be helpful. I should be on your call list, I left a message this morning, but wanted to follow up with an email.

(Doc. 37-16.)

Plaintiff's essays were usually not late, however; Leigh was rarely in his office when Plaintiff put them on his desk, so she did not know when he would look at her essays. (Doc. 37 ¶ 106.) Contrary to his email, Leigh also never told Plaintiff to use shift overlap time to do the

assignments. (*Id.* ¶ 107.) During a July 25, 2016 follow-up meeting, Leigh told Plaintiff that he was considering discharging her in thirty days because Plaintiff's last two essay assignments had been late. (*Id.* ¶ 123.)

On July 26, 2016, Plaintiff emailed McCollum regarding the discharge threats Leigh had made, and notified him that she had sent complaint paperwork into the EEOC for use in preparing a charge of discrimination. (*Id.* ¶ 130.) Plaintiff sent the EEOC two sets of handwritten notes which included descriptions of her work environment under Burleson and Leigh. (*Id.* ¶¶ 145-148.) Plaintiff also sent emails outlining her complaints to Walgreen's Director of Pharmacy and Retail Operations Randy Reddick and Regional Vice-President Connie Latta. (*Id.* ¶ 131.) Plaintiff requested to be transferred to a different store. (*Id.* ¶ 133.) Reddick called Plaintiff several days later explaining that he supported Leigh and McCollum. (*Id.* ¶ 134.)

On August 24, 2016, Leigh discharged Plaintiff. (*Id.* ¶ 140.) Leigh did not give a reason for Plaintiff's discharge and did not give her a separation notice. (*Id.* ¶ 141.)

Walgreen did not post Plaintiff's position, seek applicants for the position, or hire anyone to replace Plaintiff. (Doc. 29 ¶¶ 26-27.) Instead, other employees at the Piney Flats store assumed Plaintiff's job duties. (*Id.* ¶ 28.) Approximately five months after Plaintiff's termination, Samuel St. John, a male shift lead at another Walgreen location, approached Leigh and requested transfer to Piney Flats due to personal issues he was having. (*Id.* ¶¶ 29-30.) Leigh granted the request for transfer. (*Id.*)

Plaintiff brought the present action on August 23, 2017, alleging Defendant violated the ADEA by engaging in age discrimination and retaliation, and through maintaining a hostile work environment; the THRA by engaging in sex discrimination, age discrimination, and retaliation,

and through maintaining a hostile work environment; and the ADA by engaging in disability discrimination and retaliation, and through maintaining a hostile work environment. (Doc. 25 ¶ 2.)

## II.   ANALYSIS

### A.   Motion to Strike

Defendant moves to strike three affidavits which Plaintiff submitted to the Court concurrent with her submission of a response to Defendant's motion for summary judgment—an affidavit from former Unaka-Broadway store manager Winston Richey (Doc. 36), an affidavit from former co-worker Tammy Triplett (Doc. 35), and an affidavit from Plaintiff (Doc. 37). (Doc. 40.) Defendant similarly moves to strike several exhibits Plaintiff submitted at the same time. (*Id.*) In response, Plaintiff argues that the affidavits and summary judgment exhibits are not "pleadings" which are subject to being struck from the record. (Doc. 42.)

Under Federal Rule of Civil Procedure 12(f), a court may only strike material that is contained in pleadings. *Fox v. Michigan State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006); *Agent v. Buffalo Valley, Inc.*, No. 1:13-0133, 2015 WL 1756891, at *1 (M.D. Tenn. Apr. 17, 2015) (motions to strike are "disfavored, and typically only apply to pleadings, not evidentiary offerings such as affidavits"). Rule 7(a) defines "pleadings" as "a complaint; an answer to a complaint; an answer to a counterclaim designated as a counterclaim; an answer to a crossclaim; a third-party complaint; an answer to a third-party complaint; and if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a). "Exhibits attached to a dispositive motion are not 'pleadings' within the meaning of Fed. R. Civ. P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f)." *Fox*, 173 F. App'x at 375. Accordingly, the Court will not strike Plaintiff's affidavits and exhibits under Rule 12.

Defendant also makes arguments under Rule 37(c), which provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). Defendant argues that Plaintiff failed to supplement her initial disclosures and responses to written discovery requests by failing to disclose the existence of the Richey and Triplett affidavits. (Doc. 40 at 4.) Plaintiff responds stating that both Richey and Triplett were disclosed as potential witnesses in Plaintiff's Rule 26(a) disclosures, and that Plaintiff testified as to what she believed each witness knew during her deposition. (Doc. 42 at 11.) Plaintiff also states that, as is apparent from the dates on each affidavit, they existed, at most, for one day before Plaintiff provided them to Defendant, and that they were provided when Plaintiff filed her response in opposition to Defendant's motion for summary judgment. (*Id.* at 5.) Accordingly, Plaintiff states that her disclosure to Defendant was timely, and that it would be an unreasonable burden to require her to set out the details to which an affiant may testify when making an initial disclosure of the witness.

Because Plaintiff disclosed Richey and Triplett as potential witnesses, and because Defendant has not otherwise argued how it has been unduly prejudiced or misled by Plaintiff, the Court will also decline to strike the affidavits under Rule 37.

Last, as to Plaintiff's affidavit, Defendant argues that Plaintiff has attempted to create a factual issue after a motion for summary judgment was made, which contradicted her earlier deposition testimony. Under the "sham affidavit doctrine," parties are precluded from creating a factual issue for trial by submitting an affidavit that directly contradicts prior sworn testimony. *See French v. Lucas*, 836 F.3d 612, 622-24 (6th Cir. 2016). Defendant believes this doctrine applies in regard to portions of Plaintiff's affidavit describing her stocking of jugs of detergent,

describing the actions of an associate named "Eric Buck," describing whether Burleson disparaged Mark Campbell, and describing whether Plaintiff looked out a Walgreen's store window to see Burleson staring at her. (Doc. 40 at 1-3.) Because the Court does not consider any of the portions Defendant disputes to be material in its discussion regarding Defendant's motion for summary judgment, below, the Court will not discuss whether each portion of Plaintiff's affidavit merits treatment under the sham affidavit doctrine.[4]

Defendant's motion to strike (Doc. 40) will be **DENIED**.

### B.     Motion for Summary Judgment

#### 1.     Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court should view the evidence, including all reasonable inferences, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

---

[4] The Court's denial of Defendant's motion to strike on these grounds does not necessarily mean that the Court could properly rely on all of the contents of the contested documents when deciding Defendant's dispositive motion. Rule 56 provides that a court may rely on materials presented in a motion for summary judgment so long as the material would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(2). Affidavits and declarations used to support a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Defendant states that portions of evidence should be disregarded by the Court because of violations of the best evidence rule, Fed. R. Evid. 1001, and the rule against hearsay, Fed. R. Evid. 802. (Doc. 40 at 5-7.) In the analysis below, the Court bears this requirement in mind, and addresses any of Defendant's further evidentiary arguments regarding Plaintiff's affidavits and exhibits where they are relevant.

*Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

To survive a motion for summary judgment, "the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). Indeed, a "[plaintiff] is not entitled to a trial on the basis of mere allegations." *Smith v. City of Chattanooga*, No. 1:08-cv-63, 2009 WL 3762961, at *2-3 (E.D. Tenn. Nov. 4, 2009) (explaining the court must determine whether "the record contains sufficient facts and admissible evidence from which a rational jury could reasonably find in favor of [the] plaintiff"). In addition, should the non-moving party fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should grant summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

### 2. Factual Scope of Plaintiff's Claims

Before turning to each of Plaintiff's individual causes of action, the Court must address the scope of facts to which those causes of action may apply. Defendant argues Plaintiff's ADEA and ADA claims are limited to the facts of Plaintiff's employment at the Piney Flats store due to the EEOC charge upon which Plaintiff's claims are based. (Doc. 28 at 24-25.) Defendant notes that Plaintiff's charge only discusses her employment at the Piney Flats store and her alleged

mistreatment by Leigh.  The charge states that the earliest date of Plaintiff's discrimination was December 15, 2015 (Plaintiff's date of transfer to the Piney Flats store), and Plaintiff left a checkbox for "continuing action" unchecked.  (Doc. 28-2.)

In spite of these aspects of the charge, however, the Court does not agree that it prevents the Court from considering facts from Plaintiff's experience at other Walgreen store locations in light of other materials which were submitted to the EEOC.

Before suing an employer, a plaintiff bringing an action under the ADEA or ADA must file a charge with the EEOC and receive a right-to-sue letter.  *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000); *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 462-65 (6th Cir. 1998).  A Plaintiff's charge is sufficient if the EEOC is able to "identify the parties and . . . [if the plaintiff] describe[s] generally the action or practices complained of."  29 C.F.R. § 1601.12(b).  The purpose of filing the charge is to trigger the investigatory and conciliatory procedures of the EEOC so that the Commission may first attempt to obtain voluntary compliance with the law.  *See EEOC v. The Bailey Co., Inc.*, 563 F.2d 439, 447 (6th Cir. 1977) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970), *cert. denied*, 435 U.S. 915 (1978)).  In federal court, the plaintiff may present only those claims raised in the EEOC charge or claims which would be "reasonably expected to grow out of the charge[.]"  *Cleveland Branch, N.A.A.C.P. v. City of Parma, Oh.*, 263 F.3d 513 (6th Cir. 2001).

The Court first notes that this procedural requirement tends to discuss the *claims* that a Plaintiff can bring in federal court as a result of their charge, not the *facts* a court may rely on in exploring those claims.  For example, in a case cited by Defendant, *Ang v. Procter & Gamble Co.*, the Court of Appeals for the Sixth Circuit observed that a district court did not clearly err in concluding that a plaintiff was precluded from bringing a race discrimination claim when his

EEOC charge only mentioned national origin discrimination, and when the plaintiff was assisted by counsel in writing the charge. 932 F.2d at 546-47. Defendant cites no authority for the principle that courts cannot consider certain facts when analyzing claims which *are* included in an EEOC charge. The only case Defendant cites which mentions the date in an EEOC charge is an unreported district court case which found a hostile work environment claim to be barred for failure to exhaust administrative remedies. *Smith v. Tenn. Dept. of Heath*, No. 3-12-0611, 2014 WL 1847839, at *1 (M.D. Tenn. May 8, 2014). In that case, however, the plaintiff's charge did not include a claim for a hostile work environment. *Id.* The court merely noted that, in addition, the plaintiff's charge stated a specific date when an adverse employment action had taken place, which was also inconsistent with a continuing hostile work environment claim. *Id.*

By contrast, here, Plaintiff's charge alleges she experienced age discrimination, disability discrimination, and retaliation, which encompass all of her federal claims before this Court.

Moreover, "[w]hen the EEOC investigation of one charge *in fact* reveals evidence of a different type of discrimination against the plaintiff, a lawsuit based on the newly understood claim will not be barred." *Davis*, 157 F.3d at 462-65 (emphasis in original). While this principle is again concerned with the claims a plaintiff may bring, it stands for the idea that a plaintiff may sue an employer in federal court on grounds the EEOC has already investigated, regardless of the charge. This rule makes practical sense, in that it would be illogical to bar a claim based on a plaintiff's supposed failure to present it to the EEOC, when, in fact, the EEOC has already investigated the claim.

Here, Plaintiff has shown that the EEOC had facts before it regarding Plaintiff's employment at the State of Franklin and Unaka-Broadway stores. (*See* Docs. 37-18, 37-18, 37-20.) Plaintiff submitted handwritten notes to the EEOC which described her work environment at

those stores, and the EEOC stamped the notes with Plaintiff's EEOC charge number or case number. (*See* Docs. 37-18, 37-18, 37-20.) Because the EEOC has already been presented with those facts during its investigation, the Court does not find that Plaintiff's claims before this Court must be limited to facts involving the Piney Flats store. Instead, the Court will consider facts related to Plaintiff's experience at all three Walgreen locations when considering her claims of discrimination.[5]

In a final effort, Defendant argues that the notes submitted by Plaintiff are out of court statements which are hearsay, should Plaintiff offer them to prove the truth of the matter asserted. (Doc. 40 at 7 (citing Fed. R. Evid. 801, 802).) The notes are not hearsay in this context because Plaintiff is offering them to prove notice to the EEOC, as well as the scope of the EEOC's investigation, not the truth of the matters asserted therein.

While the Court has rejected the legal basis for Defendant's multiple efforts to cut down the factual scope of Plaintiff's case, the Court notes that Plaintiff's arguments regarding those facts are difficult to parse. Plaintiff's twenty-five-page response brief is devoid of the use of headings until page twenty-two, and consists primarily of a restatement of the facts as understood by Plaintiff, untethered to legal argument regarding specific theories of discrimination. (*See* Doc. 34.) Because of the length of time Plaintiff worked for Defendant, the record is sprawling. Plaintiff's affidavit itself spans one-hundred fifty-four numbered paragraphs. (*See* Doc. 37 at 1-

---

[5] The Court also notes that this finding is consistent with precedent which tends to liberally interpret plaintiffs' EEOC charges due to matters of policy. *Davis*, 157 F.3d at 462-65. Because such charges are frequently filed by lay complainants, courts have observed that plaintiffs should not be later barred by any failure to attach the correct legal conclusion to a claim, to conform to procedural technicalities, or to include exact wording, so long as the claims brought in district court would have been "reasonably expected to grow out of the charge." *Davis*, 157 F.3d at 462-65; *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir. 1991) ("Courts require this broad reading of the charge because most Title VII claimants are unschooled in the technicalities of the law and proceed without counsel.").

45.)  In addition, Plaintiff seems to concede that she "is not claiming that she is entitled to recover damages for the earlier years during which Burleson tormented her at the State of Franklin Road Walgreen store.  She is insisting that the Court and jury should consider these earlier gender-based hostile episodes as evidence of Burleson's continuing malicious intent. . ." (Doc. 34 at 4.)  Because of this, the Court considers these facts only in relation to Plaintiff's hostile work environment and sex discrimination claims.  The Court also remains mindful it is "not required to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Emerson v. Novartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (internal quotations marks omitted).  Instead, the Court focuses on those facts which Plaintiff most clearly ties to legal argument.

### 3.  Age Discrimination Claims

### A.  Unlawful Termination

The ADEA "prohibits an employer from taking an adverse employment action against an employee because of that employee's age."[6] *Marsh v. E. Associated Estates Realty*, 521 F. App'x 460, 465 (6th Cir. 2013) (citing 29 U.S.C. § 623(a)).  A "plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Id.* at 466 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)); *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) ("A plaintiff may establish a claim under the ADEA by offering either direct or circumstantial evidence of age discrimination.").  If inferences are required in order to conclude that the challenged employment action violated the ADEA, the evidence is classified as circumstantial, and the plaintiff must satisfy the *McDonnell Douglas* framework in order to establish an ADEA

---

[6] The same analysis is applicable to Plaintiff's THRA age discrimination claim.  *Newsom v. Textron Aerostructures, a div. of Avco, Inc.*, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995) (applying the ADEA framework to an age discrimination claim under the THRA).

violation. *Marsh*, 521 F. App'x at 456; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Because Plaintiff does not argue that she has direct evidence of age discrimination, the Court will analyze Plaintiff's claim under the *McDonnell Douglas* framework. (*See* Doc. 34.)

Under such analysis, a plaintiff may establish a prima facie case of age discrimination by showing: (1) she was at least forty years old at the time of the alleged discrimination; (2) she suffered an adverse employment action; (3) she was qualified for the position she held; and (4) she was either replaced by a younger worker or treated differently than similarly situated individuals. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008); *Smith v. Wrigley Mfg. Co., LLC*, No. 18-5397, 2018 WL 5096379, at *2-3 (6th Cir. Oct. 18, 2018). If the plaintiff makes this showing, "the burden of production shifts to the defendant to articulate a nondiscriminatory reason for its action." *Harris v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010). If the defendant meets the burden of showing a nondiscriminatory reason for its action, then "the burden of production shifts back to the plaintiff to show that the [defendant's] proffered reason was mere pretext for intentional age discrimination." *Id.*

The parties dispute whether Plaintiff can prove her prima facie case of age discrimination particularly in regard to the fourth prong—whether she was replaced by a younger worker or received different treatment than similarly situated individuals. (Doc. 28 at 13.) The Court concludes that Plaintiff cannot make this showing.

Defendant has presented evidence, through the affidavit of Robert Leigh, that it did not post Plaintiff's position, seek applicants for the position, or hire anyone to replace Plaintiff. (Doc. 29 ¶¶ 26-27.) Instead, other employees at the Piney Flats store assumed Plaintiff's job duties. (*Id.* ¶ 28.) Approximately five months after Plaintiff's termination, Samuel St. John, a male shift lead

at another Walgreen location, approached Leigh and requested transfer to the Piney Flats store due to personal issues he was having at the other location, and Leigh "did not deny" the request for transfer. (*Id.* ¶¶ 29-30.) In response to this evidence, Plaintiff argues that Leigh's affidavit indicates that Plaintiff "was actually replaced five months after her discharge by the younger Samuel St. John who transferred to the Piney Flats store from another Walgreen store in the area." (Doc. 34 at 2.) Plaintiff otherwise presents no evidence rebutting the factual accuracy of Leigh's recounting of the events which took place after Plaintiff's termination.

According to the legal standard for "replacement," a "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *See Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (citing *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1117 (6th Cir. 1980)); *see also Grosjean v. First Energy Corp.*, 349 F.3d 332, 335-36 (6th Cir. 2003); *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement"); *Godfredson v. Hess & Clark*, 173 F.3d 365, 372-73 (6th Cir. 1999). Because Plaintiff's work was redistributed to other workers for five months, and because Leigh was solely passive in accepting a request for transfer by St. John five months after Plaintiff's termination, the Court finds that Plaintiff was not replaced by a younger worker, nor were her job duties reassigned to St. John such that they can be ascribed to Defendant's initiative.

Plaintiff alternatively tries to make out a prima facie case for age discrimination by arguing that she was treated less favorably than Shift Lead Chris Wolfe, a "substantially younger" employee. (Doc. 34 at 2.)

"[A] plaintiff may make out a prima facie case by showing 'that a comparable non-protected person was treated better.'" *Parries v. Makino, Inc.*, 148 F. App'x 291, 296 (6th Cir. 2005) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992)). But, to establish a disparate treatment claim, the plaintiff must show that she was similarly situated in all relevant respects to the comparable worker. *Id.* "In a discriminatory discipline or firing context, 'similarly-situated' means that 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell*, 964 F.2d at 583). Any misconduct must be of comparable seriousness. *See id.*

The Court finds that Plaintiff did not engage in misconduct of comparable seriousness to Chris Wolfe—she engaged in more serious misconduct, such that she cannot argue Wolfe was a comparable worker to herself. Taking the evidence in the light most favorable to Plaintiff, Plaintiff experienced initial performance issues when starting work at the Piney Flats store, such as failing to complete a smart-count in early March 2016. (Docs. 28-11 at 4; 29 ¶¶ 4-7.) On two occasions in March, Leigh met with Plaintiff to recap prior work days because a sufficient amount of work had not been completed by Plaintiff. (Doc. 28-11 at 4-5.) By June 2016, Plaintiff was continuing to have problems complying with overtime policy, and had clocked overtime in each of the last three pay periods. (*Id.*) In April 2016, Leigh began assigning self-improvement articles for Plaintiff to read, and directed her to write one-page summaries. (*Id.*) Leigh noted that the summaries were submitted late on multiple occasions. (*Id.*)

On June 7, 2016, Leigh and Lunsik met with Plaintiff and placed her on a Performance Improvement Plan ("PIP"). The written PIP reflects that Leigh believed Plaintiff needed to show

significant improvement in people leadership, operations and business leadership, and functional competency. (Doc. 28-11 at 3.) In Defendant's view, Plaintiff continued to have performance issues, such as the further late completion of essay summaries of assigned improvement articles, late or incomplete posting of cigarette and liquor inventory, problems with communication, and problems with team member engagement, among others. (Doc. 28-11 at 13-14.) Leigh's email to Michelle Stevens regarding Plaintiff's potential termination noted that Leigh had seen "very little improvement" in Plaintiff's performance, and that several of her essay assignments had been turned in late. (Doc. 37-16.)

Plaintiff submits that her essay commentaries were "usually not late." (Doc. 37 ¶ 106.) But even viewing that evidence in the light most favorable to Plaintiff, her use of a modifier indicates that there were some occasions when her essay summaries were late. (Doc. 37 ¶ 106.) Moreover, Plaintiff does not submit evidence contesting her initial performance shortcomings at the Piney Flats location, but refers to them as "alleged," and states that she was "upset by the unexpected assault" on her pre-hospitalization performance when Leigh gave her a verbal warning concerning it. (Doc. 37 ¶ 66.) Plaintiff also does not submit evidence disputing that she had problems with complying with the Walgreen overtime policy, or that she failed to complete the liquor inventory, for instance. (Doc. 37 ¶ 114.) Plaintiff states that she was having difficulty getting all of her work done each day. (*Id.* ¶ 119.)[7]

---

[7] The Court agrees with an argument by Defendant that much of what Plaintiff presents are her own subjective theories about how she believes she was unfairly targeted by Defendant on these grounds. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (discussing "rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law"); *see also McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (no material issue of fact is raised regarding the quality of an employee's work by the employee's challenging of the judgment of his or her supervisors). For instance, Plaintiff presents no evidence that the side door of the Piney Flats store was left unlocked in order to test her as an employee; that is her own subjective theory about the situation. Similarly,

In contrast to Plaintiff's deficiencies, Wolfe could not complete all tasks on the shift lead checklist (Doc. 37-15), would leave the store's shelves in a mess (Doc. 37 ¶ 120), and, on one occasion, he left the store's safe open (Doc. 37 ¶ 98). These deficiencies are not the same pervasive issues Plaintiff had with performing satisfactory work and meeting expectations in several different categories of her job description, followed by a later failure to meet expectations as set forth in her PIP. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) ("Wright cannot be considered similarly situated to Bradley for the purposes of discipline because they engaged in different conduct, and the differences in their conduct are relevant"). Accordingly, Wolfe cannot be considered as a similarly situated employee compared to Plaintiff. And because Plaintiff has not established that she was replaced by a younger worker or treated differently than a similarly situated individual, she has not presented a prima facie case for her ADEA claim.[8] *See Mickey*, 516 F.3d at 521.

While this analysis could end the Court's inquiry, Plaintiff responds by citing cases within the Sixth Circuit indicating that a mechanistic application of *McDonnell Douglas* is not appropriate. (Doc. 34 at 1-2; *see also Wanger v. G.A. Gray Co.*, 872 F.2d 142, 144 (6th Cir. 1989).) In the greater context of an ADEA claim, however, a plaintiff must present evidence

_____

Plaintiff presents no evidence that Lunsik had her work longer hours in the pharmacy in order to attempt to delay her from her shift lead duties; that is, again, her own subjective theory.

[8] Plaintiff also seems to assert that she was treated less favorably than Cathleen Bradshaw, the female shift lead at the Piney Flats store who was transferred to the Boone's Creek store to fill a vacancy which Plaintiff had requested to fill herself. (Doc. 37 ¶ 58.) However, the denial of Plaintiff's request for transfer to a specific store location is not an adverse employment action in and of itself. *See Sherman v. Chrysler Corp.*, 47 F. App'x 716, 722 (6th Cir. 2002) ("The positions into which he was seeking to transfer involved similar duties, title, pay, and conditions of work and the denial of those transfers did not, therefore, constitute adverse employment actions."). Bradshaw was otherwise not similarly situated as Plaintiff, in so far as she worked for a different supervisor than Leigh after her transfer. *Parries*, 148 F. App'x at 296.

indicating that her termination was pretextual and that age discrimination was the true, "but for" cause of her employer's decision. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *accord Trapp*, 485 F. App'x at 761 ("Even if Trapp had presented evidence refuting TSS's stated reasons, he produced little evidence pointing to age as the real reason for his discharge."). Here, however, the record is practically devoid of circumstantial evidence of age discrimination.

Plaintiff points to being called "slow" by Leigh as evidence of age discrimination, but that comment is ambiguous at best because it is not strongly correlated with age, but could constitute a critique of Plaintiff's ability to complete tasks during her shift. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025-26 (6th Cir. 1993) ("isolated and ambiguous comments 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination . . .'" (quoting *Gagné v. Nw. Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989)); *see also Trapp*, 485 F. App'x at 761 (reference to another employee as "old and inflexible" was isolated and insufficient to satisfy burden of production on pretext).[9] Viewing the evidence in the light most favorable to Plaintiff, the Court does not find that she has "come forward with specific facts to demonstrate" that age discrimination was the "but for" cause for her termination. *Chao*, 285 F.3d at 424.

The Court will **GRANT** Defendant's motion for summary judgment (Doc. 27) as to Plaintiff's claims for age discrimination under the ADEA and THRA.

### B. Hostile Work Environment due to Age-Based Harassment

Because of the lack of evidence regarding age-based harassment, the Court also finds that Plaintiff has failed to establish a hostile work environment claim under the ADEA. *See Scola v.*

---

[9] It is also notable that during the numerous occasions on which Plaintiff complained to superiors at Walgreen about being treated unfairly, she never mentioned that she believed it was because she was older. (Doc. 28 at 15.) And when Plaintiff was asked in her deposition as to why she believed Leigh was biased against her due to age, she responded that she did not know, but that it was the way she felt. (*Id.* at 18-19.)

*Publix Super Markets, Inc.*, 902 F. Supp. 2d 1083, 1096-97 (E.D. Tenn. 2012), *aff'd in part sub nom. Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458 (6th Cir. 2014).

In order to establish a hostile work environment claim founded on age-based harassment, Plaintiff would have to show that the harassment had the effect of unreasonably interfering with her work performance, and created an objectively intimidating, hostile, or offensive work environment, among other elements. *See id.* In determining whether this element is met, "the court can look to see whether [the workplace] is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted)). Plaintiff has not come forward with facts showing she was subjected to the sort of age-based harassment which would merit relief under this standard. *See Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996) ("plaintiff has virtually no evidence that the 'harassment' of which she complains was in any way based on her age"); *Scola*, 557 F. App'x at 471-72 ("old lady" comments, standing alone, cannot reasonably have created an age-based hostile work environment).

The Court will **GRANT** Defendant's motion for summary judgment (Doc. 27) as to Plaintiff's claim that she was subject to a hostile work environment due to age-based harassment under the ADEA.

## C.      ADEA Retaliation

Plaintiff brings claims for retaliation "premised on her repeated objections to the continuing hostile work environment and her announced participation in the EEOC reporting process." (Doc. 34 at 25.)

The anti-retaliation provision of the ADEA provides: "It shall be unlawful for an employer to discriminate against any of his employees . . . because such individual, member or applicant for membership has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). "A plaintiff in a Title VII or ADEA action may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Med. Prod., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Because Plaintiff has no direct evidence that Defendant terminated or subjected her to an adverse employment action due to protected activity, Plaintiff's retaliation claim is examined under the *McDonnell Douglas* burden shifting framework. *See id.*

In order to state a prima facie case of retaliation under the ADEA, a plaintiff must show: (1) that she engaged in protected activity; (2) that the defendant had knowledge of her protected conduct; (3) that the defendant took an adverse employment action towards her; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007); *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002). As to the first element, "protected activity may include either participation in any proceeding under the ADEA (the so-called 'participation clause') or opposition to a practice declared discriminatory under the ADEA (the 'opposition clause')." *Speck v. City of Memphis*, 594 F. Supp. 2d 905, 923 (W.D. Tenn. 2009), *aff'd*, 370 F. App'x 622 (6th Cir. 2010). The Sixth Circuit has observed that "the burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

First, Plaintiff engaged in protected activity under the participation clause when she came in contact with the EEOC regarding alleged harassment in June 2016.[10]  (Doc. 37 at 30 ¶ 100.)  Second, Defendant had knowledge of Plaintiff's protected conduct, as Plaintiff stated that she told District Manager McCollum and a Walgreen hotline complaint representative about the charge.  (*Id.* ¶¶ 100-01.)  Leigh also told Plaintiff that he did not care if Plaintiff "turned him in" to the EEOC, indicating his awareness of her participation in filing a charge.  (*Id.* ¶ 102.)  Third, Plaintiff was subject to an adverse employment action when she was terminated on August 24, 2016.  (*Id.* ¶ 140.)  And as to the fourth and final element, Plaintiff argues that the temporal proximity between her telling Defendant in June and July of 2016 about her EEOC communications, followed by her termination in August 2016, creates an inference of discrimination.  (Doc. 34 at 25.)

"The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."  *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007).  However, there are "circumstances where temporal proximity, considered with other evidence of retaliatory conduct would be sufficient to establish a causal connection."  *Id.*

Viewing the factual timeline in the light most favorable to Plaintiff, Plaintiff told Defendant about her EEOC communications on June 17, 2016.  (Doc. 37 ¶ 100.)  Then on June 26, 2017, Leigh advanced the date upon which Plaintiff had to turn in a self-improvement essay as part of her PIP.  (*Id.* ¶ 103.)  On July 19, 2016, Leigh emailed Michelle Stephens in Walgreen's Human Resources Department inquiring whether Plaintiff could be terminated based on late essay submissions.  (Doc. 37-16.)  On July 25, 2016, Leigh told Plaintiff that he was considering

---

[10]  Without further explanation, Defendant attempts to incorrectly confine Plaintiff's retaliation claim by stating, "Plaintiff's retaliation clause falls within the 'opposition' clause." (Doc. 28 at 15.)  Plaintiff later clarifies that her claim is also based on "announced participation in the EEOC reporting process."  (Doc. 34 at 25.)

discharging her in thirty days because Plaintiff's last two essay assignments had been late. (*Id.* ¶ 123.) Plaintiff was terminated less than one month later. (*Id.* ¶ 140.) Thus, in addition to the temporal proximity between her EEOC participation and termination, intervening developments indicate Leigh may have retaliated against Plaintiff by unfairly ramping up the essay requirements within her PIP. The Court finds Plaintiff has presented a sufficient causal connection between her protected activity and the adverse employment action for purposes of establishing a prima facie case of retaliation. *See Tuttle*, 474 F.3d at 321 (termination three months after filing EEOC complaint plus intervening verbal threats sufficient to establish causal connection).

Because Plaintiff has pointed to facts supporting a prima facie case for retaliation, the burden shifts to Defendant to produce evidence of a legitimate, nondiscriminatory reason for its actions. *Imwalle*, 515 F.3d at 544. Defendant has met this burden, as a failure to perform satisfactory work and meet expectations, followed by a later failure to meet reasonable expectations as set forth in a PIP, are legitimate, nondiscriminatory reasons for an employee's termination. *See Tennial v. United Parcel Serv., Inc.*, 840 F. 3d 292, 303 (6th Cir. 2016); *Webb v. ServiceMaster BSC LLC*, 438 F. App'x 451, 454 (6th Cir. 2016); *Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 732 (S.D. Ohio 2001), *aff'd*, 504 F. App'x 473 (6th Cir. 2012).

Plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by Defendant was not its true reason, but instead was a pretext designed to mask retaliation. *Imwalle*, 515 F.3d at 544. "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 n.4 (6th Cir. 2009). "This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.* A plaintiff may establish pretext by showing that an employer's proffered reasons (1) have no basis in fact; (2) did not

actually motivate the action; or (3) were insufficient to warrant the action. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012).

Plaintiff attacks Leigh's stated reason for her termination through evidence indicating that Leigh aimed to ensure Plaintiff would not successfully complete the essay assignments required by her PIP. In doing so, Plaintiff suggests that Leigh was attempting to establish a reason to terminate her which did not actually motivate the action.

Plaintiff has testified that her work assignments made it impossible to complete the reading and written essay assignments on time, that she was not given any time at work to complete the assignments, and that Leigh unexpectedly advanced the due date on one of the assignments. (Doc. 37 ¶¶ 103, 107.) Plaintiff also believed that the articles and essay commentaries were not related to her job duties. (*Id.* ¶ 79.)

Because one of Leigh's main concerns was that Plaintiff did not work fast enough or complete enough work, assigning further work which required reading and writing beyond Plaintiff's general duties may have been a questionable management strategy under the circumstances. Most managers would likely anticipate that Plaintiff would not be able to successfully take on additional assignments, and if the reading and writing was unrelated to her general job duties, the assignments would not help her with her tasks. Thus, there appears to be a legitimate question as to whether Plaintiff's PIP was truly aimed at performance "improvement."

Plaintiff also submits an affidavit of Winston Ritchey, a store manager for Walgreen from 2005 to 2017. (Doc. 36 ¶ 2.) He states that Walgreen store managers "were not authorized to required [sic] any employee to read any type of performance-improving or life improvement articles at home" or "while off the clock." (*Id.* ¶ 15.) He also states that Walgreen had a "GROW program which consisted of structured counseling," but that "[p]er Walgreen policy, the manager

could not arbitrarily direct the participating employee which books or articles to read and could not require the employee to write commentaries on them." (*Id.* ¶ 16.) In addition, he comments that, "any PIP assigned reading" was required to "be relevant to the employee's actual job duties and to the performance deficiencies which had been noted on the employee's recent performance evaluation." (*Id.* ¶ 19.) These facts suggest Leigh did not follow Walgreen policy, which further indicates that Plaintiff's PIP requirements may have been unfairly designed to set Plaintiff up for termination.

While Defendant states that Leigh had successfully used the essay assignments when managing a male pharmacist, Plaintiff's position as a shift lead had different job duties and expectations. The Court, considering the facts in the light most favorable to Plaintiff, must credit her testimony that the assignments did not relate to her job duties or help her with her job. (*See* Doc. 37 ¶ 79.)

The Court finds there is a material dispute of fact as to whether Plaintiff's failure to successfully complete the PIP, particularly in regard to Leigh's focus on her failure to complete additional essay assignments on top of her workload, was the true motivation for her termination.

The Court will **DENY** Defendant's motion for summary judgment (Doc. 27) as to Plaintiff's ADEA retaliation claim. Because "[r]etaliation claims under the THRA follow federal law," *Wade v. Automation Pers. Servs., Inc.*, 612 F. Appx. 291, 300 (6th Cir. 2015), and, "a retaliation claim under both statutes follows the same analysis," *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008), the Court will **DENY** Defendant's motion for summary judgment (Doc. 27) as to Plaintiff's retaliation claim under the THRA. *See also Phillips v. Interstate Hotels Corp.*, 974 S.W.2d 680, 683 (Tenn. 1998) ("Although the language differs slightly, it is clear that the legislature intended the THRA to be coextensive with federal law.").

### 4. Sex-Based Discrimination Claims

### A. Wrongful Termination

While Plaintiff does not assert a claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), sex discrimination claims brought pursuant to the THRA are evaluated in the same manner as a federal Title VII claim. *See Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009); *Battle v. Haywood Cty. Bd. of Educ.*, 488 F. App'x 981, 986 (6th Cir. 2012). Direct or circumstantial evidence may be used to establish a claim of sex discrimination. *See Sybrandt*, 560 F.3d at 557. As with Plaintiff's ADEA claim, Plaintiff does not bring any direct evidence indicating that she was terminated on the basis of her sex, and any "[c]ircumstantial evidence of sex discrimination is analyzed under the burden shifting framework" set forth in *McDonnell Douglas*. *See id.* To establish a prima facie case of sex discrimination under the *McDonnell Douglas* framework, Plaintiff must show that: "(1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Collins v. Memphis Goodwill Indus., Inc.*, 489 F. App'x 901, 907 (6th Cir. 2012) (internal quotation marks omitted).

For the reasons described above, the Court finds that Plaintiff cannot establish the fourth prong of a prima facie case of sex discrimination under the THRA—she was not "replaced" by someone outside the protected class, or treated differently than a similarly-situated, non-protected employee. Viewing the evidence beyond the technicalities of the *McDonnell Douglas* framework, the Court also finds an absence of facts which would indicate Plaintiff was terminated by Leigh because of her gender. *See Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 647 (6th Cir. 1998) (plaintiff can also avoid summary judgment by producing evidence that the defendant treated the

plaintiff worse because of her gender, that is, evidence that tends to establish intentional discrimination).  When asked why Plaintiff believed Leigh was biased against her because of her gender, she stated that she did not know why, but that it was the way she "feels."  (Doc. 28-1 at 181-82.)  Plaintiff also stated that Leigh never made any negative comments towards her regarding her sex.  (*Id.* at 308.)

The Court will **GRANT** Defendant's motion for summary judgment (Doc. 27) as to Plaintiff's THRA sex discrimination claim.

### B.     Hostile Work Environment on Sex-Based Harassment

Plaintiff also appears to bring a sex-based harassment hostile work environment claim pursuant to the THRA.  (*See* Doc. 25 ¶ 2.)

The THRA has a one-year statute of limitations period.  *See* Tenn. Code Ann. § 4-21-311(d).  A plaintiff must allege a specific incident of sex-based harassment which occurred within this limitations period in order to bring a sex-based harassment hostile work environment claim under the THRA.  *See Jones v. City of Franklin*, 309 F. App'x 938, 944 (6th Cir. 2009).

Plaintiff's termination fell within the one-year statute of limitations by one day.  (*See* Docs. 1 (filed August 23, 2017), 25 at 10, ¶ 25 (Plaintiff terminated August 24, 2016).)  The Court has concluded above, however, that Plaintiff has not alleged facts indicating she was terminated on the basis of her sex.  And because Plaintiff has not otherwise alleged a specific incident of harassment which occurred within the one-year time period for filing suit, Plaintiff's sex-based hostile work environment THRA claim is time-barred.  *See Jones*, 309 F. App'x at 944 (plaintiffs identified "no specific facts probative of a hostile work environment that occurred during the year that preceded the filing of their complaints," so claim was time-barred); *Brown v. City of Springhill,* No. 01:06-0098, 2008 WL 974729 at *4 (M.D. Tenn. April 8, 2008) (where plaintiff's allegations concerning

a hostile work environment consist of facts that occurred more than one year before the filing of the complaint, such a claim is time-barred).

The continuing-violations doctrine, which tolls a limitations period when an employer's conduct represents an ongoing unlawful employment practice, does not change this result. Plaintiff must still allege she suffered a specific discriminatory act within the applicable limitations period in order to rely on the continuing-violations doctrine. *See Pittman v. Spectrum Health Sys.*, 612 F. App'x 810, 813 (6th Cir. 2015). She has not done so.

The Court will **GRANT** Defendant's motion for summary judgment (Doc. 27) as to Plaintiff's THRA sex-based discrimination hostile work environment claim.

### 5. Disability Discrimination Claims

The ADA prohibits discrimination by covered entities "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

While Defendant initially made arguments under an assumption that Plaintiff advanced a theory of disability discrimination based upon unlawful termination, Plaintiff responded by stating that her ADA claims are "based upon Leigh's deliberately violating Walgreen policy by assigning her to perform physically dangerous lifting and climbing duties (having to move the 50 pound boxes of liquid detergent improperly stored above shoulder height and having to unload the delivery truck by herself) even though Leigh knew the plaintiff had a serious heart condition which had recently required hospitalization and that she was a cancer survivor." (Doc. 34 at 25.) Plaintiff then states, "Leigh's abusing the plaintiff because of her ADA disabilities is part of his illegal continuing hostile work environment." (*Id.* (citing *Fox v. Gen. Motors Corp.*, 247 F.3d 169 (4th

Cir. 2001) (holding, as a matter of first impression in the Fourth Circuit, that a cause of action for a hostile work environment is cognizable under the ADA)).) The Court thus considers Plaintiff's arguments concerning disability discrimination under the hostile-work environment legal framework.

### A. Hostile Work Environment on Disability-Based Harassment

In order to bring a disability-based hostile-work environment claim, a plaintiff must show (1) she was a member of the protected class, that is, she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile or offensive work environment; and (5) the existence of liability on the part of the defendant. *See Gentry v. Summit Behavioral Healthcare*, 197 F. App'x 434, 437-38 (6th Cir. 2006). The Sixth Circuit has also observed that, "[t]he standard for ADA hostile work environment claims tracks that used for hostile work environment sexual harassment claims." *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 858 (6th Cir. 2002); *Clark v. Whirlpool Corp.*, 252 F. Supp. 2d 528, 538 (N.D. Ohio 2003), *aff'd*, 109 F. App'x 750 (6th Cir. 2004). The hostile work environment standard as set forth by the Supreme Court states that "the workplace must be permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe and pervasive as to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993)). "Moreover, the purported harassment must be 'because of the employee's protected status.'" *Cannon v. Univ. of Tennessee*, No. 3:15-CV-576, 2017 WL 2189565, at *13 (E.D. Tenn. May 17, 2017) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007)); *Plautz v. Potter*, 156 F. App'x 812, 819 (6th

Cir. 2005) ("[t]here is no evidence that [plaintiff] was ridiculed or insulted because of his medical condition").

Under these standards, the Court finds Plaintiff was not subjected to any actionable harassment based on disability. Plaintiff points to the fact that Leigh required her to move heavy boxes filled with liquid detergent, and to unload delivery trucks by herself. The duties of Plaintiff's job position, however, included "overhead reaching/lifting," "climbing," "climbing ladders," "lift/carry up to 60# freq.," and "over 60# occas. Heavy Work," among others. (Doc. 37-11 at 4.) Plaintiff has presented no evidence that she was on light or restricted duty, and Leigh indicated that the store would not be able to accommodate a light-or restricted-duty shift lead. (*See id.*) As a result, assuming Plaintiff had a disability for purposes of the ADA, Plaintiff was not subject to "harassment" based on her disability by being required to perform lifting as described in her job duties. The fact that Plaintiff was required to perform the task of bringing the jugs down on a second occasion after they had been replaced does not change the Court's conclusion. (*See* Doc. 37 at ¶¶ 74-75.) Plaintiff's workplace was not "permeated" with "ridicule and insult" that was "severe and pervasive" such that it created an "abusive working environment" because of her disability. *Harris*, 510 U.S. at 21.

The Court will **GRANT** Defendant's motion for summary judgment (Doc. 27) as to Plaintiff's disability discrimination claim.

## B.     ADA Retaliation

The ADA provides: "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "The anti-retaliation provisions

of the ADA and the ADEA are nearly identical to each other . . . [t]hus the 'precedent interpreting any one of these statutes is equally relevant to interpretation of the others.'" *Thompson v. N. Am. Stainless, LP*, 520 F.3d 644, 653 (6th Cir. 2008), *rev'd and remanded on other grounds*, 562 U.S. 170 (2011) (quoting *Fogleman v. Mercy Hosp.*, 283 F.3d 561, 537 (3d Cir. 2002)).  Because the Court has already concluded the record in this case contains sufficient evidence from which a jury could reasonably find for Plaintiff on her ADEA retaliation claim, and because Plaintiff's protected activity—filing an EEOC charge—also contained a claim under the ADA, the Court will **DENY** Defendant's motion for summary judgment (Doc. 27) as to Plaintiff's ADA retaliation claim.

III.    <u>**CONCLUSION**</u>

Having assessed the arguments before it, the Court will **DENY** Defendant's motion to strike (Doc. 40) and **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment (Doc. 27).

The Court will **GRANT** the motion for summary judgment as to Plaintiff's claims for age discrimination and maintaining a hostile work environment under the ADEA; for sex discrimination, age discrimination, and through maintaining a hostile work environment under the THRA for sex-based harassment; and for disability discrimination, and through maintaining a hostile work environment under the ADA.  The Court will **DENY** the motion as to Plaintiff's claims for retaliation under the ADEA, the THRA, and the ADA.

**An Order Will Enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**